**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re Doxim, Inc. Data Security Incident Litigation. | Case No. 2:24-cv-11550<br><br>Hon. Terrence G. Berg<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jonathan McKinley, Bruce Narolis, Rose McNichols, Alex Poplawski, Brian Satterwhite, and Thomas Wardrop ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class" or "Class Members"), bring this Class Action Complaint ("Complaint") against Defendant Doxim, Inc. ("Doxim"), Credit Union ONE ("CUO"), Beacon Credit Union ("Beacon") and AmeriCU Credit Union ("AmeriCU") (collectively, "Defendants"). The allegations set forth in this Complaint are based on the personal knowledge of Plaintiffs and upon information and belief and further investigation of counsel.

## I. NATURE OF THE ACTION

1. This is a data breach class action against Defendants for failure to adequately secure and safeguard Plaintiffs' and the Class's confidential and sensitive information held throughout the typical course of business.

2. Doxim provides software as a service. The Company offers loan origination, customer relationship management, business analytics, enterprise content, and wealth management. Doxim serves credit unions, wealth management, services providers, and banking sectors in the United States and Canada.[1]

3. CUO "is a Michigan credit union offering checking accounts, credit cards, mortgages, competitive rates, online and mobile banking and much more."[2] CUO is one of Doxim's clients and in the course of their business relationship, provided Doxim with its customers' sensitive personal information.

4. Beacon is "the largest agricultural lending credit union in the nation" and serves members throughout Indiana, while offering its customers saving accounts, money market accounts, health savings, retirement savings, checking and debit cards, in addition to providing agricultural loans, home, auto and recreational loans.[3] Beacon is one of Doxim's clients and in the course of their business relationship, provided Doxim with its customers' sensitive personal information.

5. AmeriCU is a New York-based credit union, which offers its customers financial services including individual saving accounts, money market accounts,

---

[1] "Doxim Inc", Bloomberg, https://www.bloomberg.com/profile/company/1697491D:US?embedded-checkout=true (last visited Dec. 5, 2024).
[2] https://www.cuone.org/ (last visited Dec. 5, 2024).
[3] *See* https://www.beaconcu.org/history/ (last visited Dec. 5, 2024) & https://www.beaconcu.org/ (last visited Dec. 5, 2024).

health savings, retirement savings, checking and debit cards, and credit cards, as well as offering business accounts and lending, while using "modern technology to make banking easier" for its customers.[4] AmeriCU is one of Doxim's clients and in the course of their business relationship, provided Doxim with its customers' sensitive personal information.

6. Plaintiffs and Class Members are customers of Doxim's clients including CUO, Beacon, and AmeriCU.

7. On or about December 30, 2023, an unauthorized actor gained access to Doxim's network and computer systems and obtained unauthorized access to Defendants' files ("Data Breach").

8. Upon information and belief, thousands of individuals' information was affected by the Data Breach. The information exposed or otherwise accessed by an unauthorized third-party in the Data Breach included Plaintiffs and the Class Member's names, addresses, financial account numbers, and Social Security numbers ("SSN").[5] Collectively, the information described in this paragraph shall

---

[4] *See* https://www.americu.org/about-us/ (last visited Dec. 5, 2024) & https://www.americu.org/about-us/ (last visited Dec. 5, 2024).

[5] *See* Exhibit 1 for exemplar, Notice of Security Incident Dated May 31, 2024, received by Plaintiff Wardrop (effectively known as "The Notice" or "Notice"). The other Plaintiffs received largely similar notice letters. *See* Exhibit 2 (Additional Plaintiff Notices).

be referred to as "PII" (Personally Identifiable Information) throughout this Complaint.

9. Defendants learned of the suspected Data Breach on or about December 30, 2023.

10. According to Defendants, after learning of the incident, an investigation was conducted by Doxim and outside cybersecurity professionals and data privacy counsel were engaged. Defendants, so far, have yet to inform affected individuals when the investigation was completed or when Defendants learned the complete extent of the Data Breach.

11. On information and belief, Doxim notified some of its clients and their customers prior to notifying Plaintiffs and other affected Class Members. For instance, on May 29, 2024, Truliant Federal Credit Union, based in North Carolina, made a public statement that the data of some of its customers – which was in the possession of Doxim – had been compromised.[6]

12. It was not until on or about May 31, 2024, that Defendants first notified some affected individuals that their PII was impacted in the Data Breach.[7] According to the Notice from Doxim to Plaintiffs, "[A] recent security incident at Doxim Inc.,

---

[6] *See* https://www.wfmynews2.com/article/news/local/truliant-data-breach-2024/83-c8d8ca25-8133-4b32-b943-fc16a34258ee (last accessed Dec. 5, 2024).
[7] *See* Notice, received by Plaintiff Wardrop related to his banking at CUO; Exhibit 2, received by Plaintiff McKinley related to his banking at Beacon.

. . . resulted in unauthorized access to files containing your personal information. Doxim is a third-party service provider that has assisted [your credit union][8] with the preparation of account statements and/or income tax forms for its members."[9]

13. Weeks later, other impacted individuals were first notified – in a letter dated June 14, 2024, Plaintiff McNichols received notice from Doxim that, as a current or former member of St. Louis Community Credit Union ("SLCCU"), Plaintiff McNichols' data had been compromised as part of the December 30, 2023, Data Breach.[10] Plaintiff Poplawski similarly received a June 14, 2024 notice as a current or former member of AmeriCU, Plaintiff Poplawski's data had been compromised as part of the December 30, 2023, Data Breach.[11]

14. And still weeks later, other impacted individuals were first notified – in a letter dated July 5, 2024, Plaintiff Brian Satterwhite received notice from Doxim that, as a current or former member of Zeal Credit Union ("Zeal"), Plaintiff Satterwhite's data had been compromised as part of the December 30, 2023, Data Breach.[12]

15. Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative

---

[8] Each individual's credit union is named. *See, e.g.*, Notice & Exhibit 2.
[9] Notice.
[10] *See* Exhibit 2.
[11] *Id.*
[12] *Id.*

representations to Plaintiffs and the Class, to keep their PII confidential, safe, secure, and protected from unauthorized disclosure or access.

16. Plaintiffs and the Class have taken reasonable steps to maintain the confidentiality and security of their PII.

17. Plaintiffs and the Class reasonably expected Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

18. Defendants, however, breached its numerous duties and obligations by failing to implement and maintain reasonable safeguards; failing to comply with industry-standard data security practices and federal and state laws and regulations governing data security; failing to properly train its employees on data security measures and protocols; failing to timely recognize and detect unauthorized third parties accessing its system and that substantial amounts of data had been compromised; and failing to timely notify the impacted Class.

19. In this day and age of regular and consistent data security attacks and data breaches, in particular in the financial industries, and given the sensitivity of the data entrusted to Defendants, this Data Breach is particularly egregious and foreseeable.

20. By implementing and maintaining reasonable safeguards and complying with standard data security practices, Defendants could have prevented this Data Breach.

21. Plaintiffs and the Class are now faced with a present and imminent lifetime risk of identity theft or fraud. These risks are made more substantial, and significant because of the inclusion of their SSN and other static PII.

22. PII has great value to cyber criminals, especially an individuals' SSN. As a direct cause of Defendants' Data Breach, Plaintiffs' and the Class's PII is in the hands of cyber-criminals and may be available for sale on the dark web for other criminals to access and abuse at the expense of Plaintiffs and the Class. Plaintiffs and the Class face a current and lifetime risk of identity theft or fraud as a direct result of the Data Breach.

23. Defendants acknowledge the imminent threat the Data Breach has caused to Plaintiffs.[13]

24. The modern cyber-criminal can use the PII and other information stolen in cyber-attacks to assume a victim's identity when carrying out crimes such as:

a. Obtaining and using a victim's credit history;

b. Making financial transactions on their behalf and without their knowledge or consent, including opening credit accounts in their name or taking out loans;

[13] *See gen.* n.1.

c. Impersonating them in written communications, including mail, e-mail, and/or text messaging;

d. Stealing, applying for, and/or using benefits intended for the victim;

e. Committing illegal acts while impersonating their victim which, in turn, could incriminate the victim and lead to other legal ramifications.

25. Plaintiffs' and Class Members' PII was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to protect Plaintiffs' and Class Members' PII. Defendants not only failed to prevent the Data Breach, but after discovering the Data Breach in December 2023, Defendants waited until on or around May 31, 2024, to first notify some affected individuals such as Plaintiffs and members of the Class, and waited at least as late as July 5, 2024 to notify others.

26. As a result of Defendants' delayed response to the Data Breach, Plaintiffs and the Class had no idea their PII had been compromised, and that they were, and continue to be, at significant and imminent risk of identity theft, fraud, and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes because of Defendants' negligence.

27. Plaintiffs bring this action on behalf of all persons whose PII was compromised in the Data Breach as a direct consequence for Defendants failure to:

a. adequately protect consumers' PII entrusted to them,

b. warn its current and former customers and potential customers of their inadequate information security practices, and

c. effectively monitor their websites and platforms for security vulnerabilities and incidents.

28. Defendants' conduct amounts to negligence and violates federal and state statutes and guidelines.

29. As a result of the Data Breach, Plaintiffs and the Class suffered ascertainable losses, including but not limited to:

a. the invasion of privacy;

b. the compromise, disclosure, theft, and imminent unauthorized use of Plaintiffs' and the Class's PII;

c. emotional distress, fear, anxiety, nuisance, and annoyance related to the theft and compromise of their PII;

d. lost or diminished inherent value of PII; out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time or wages;

e. the continued and increased risk to their PII, which, (a) remains available on the dark web for individuals to access and abuse; and (b) remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Class.

30. Plaintiffs seeks to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose PII was compromised and stolen as a result of the Data Breach and remains at risk due to inadequate data security practices employed by Defendants.

31. Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for Negligence, Negligence *Per Se*, Unjust Enrichment, Breach of Fiduciary Duty, and Breach of Third-Party Beneficiary Contract. Plaintiffs seek injunctive relief, declaratory relief, monetary damages, and all other relief as authorized in equity by law, or any other relief the Court deems just and appropriate.

## II. PARTIES

32. Plaintiff Jonathan McKinley is, and at all relevant times was, a citizen of Logansport, Indiana. Plaintiff McKinley was a customer of Beacon Credit Union.

33. Plaintiff Bruce Narolis is, and at all relevant times was, a citizen of Morganton, North Carolina. Plaintiff Narolis was a customer of Truliant Federal Credit Union.

34. Plaintiff Rose McNichols is, and at all relevant times was, a citizen of St. Louis, Missouri. Plaintiff McNichols has been a customer of St. Louis Community Credit Union for decades.

35. Plaintiff Alex Poplawski is, and at all relevant times was, a citizen of Syracuse, New York. Plaintiff Poplawski was a customer of AmeriCU Credit Union.

36. Plaintiff Brian Satterwhite is, and at all relevant times was, a citizen of Southfield, Michigan. Plaintiff Satterwhite was a customer of Zeal Credit Union.

37. Plaintiff Thomas Wardrop is, and at all relevant times was, a citizen of Grand Rapids, Michigan. Plaintiff Wardrop is a former customer of Credit Union One.

38. Doxim was founded in 2000.[14] Doxim provides customer communications management and engagement technology solutions to highly regulated organizations, enhancing digitization, operational efficiency, and customer experience.[15]

39. Upon information and belief, Doxim is headquartered in Canada, with a major office at 1911 Woodslee Drive, Troy MI, 48083.

40. Credit Union One is a Michigan state-chartered credit union with its principal place of business in Ferndale, Michigan. In the regular course of its business, CUO takes custody of and maintains control over PII from its customers.

41. Beacon Credit Union is an Indiana-based credit union with its principal place of business in Wabash, Indiana. In the regular course of its business, Beacon takes custody of and maintains control over PII from its customers.

[14] https://www.doxim.com/about-us/.
[15] *Id.*

42. AmeriCU Credit Union is a New York-based credit union with its principal place of business in Rome, New York. In the regular course of its business, AmeriCU takes custody of and maintains control over PII from its customers.

43. Defendants collected and continue to collect the PII of its customers and clients throughout its usual course of business operations.

44. Doxim's privacy policy provides that, among other things, "Your personal information is kept securely in line with physical, technical, and administrative security measures" and "We endeavor to comply with applicable data privacy laws in the jurisdictions in which we operate."[16]

45. On its website, CUO states, "Our top priority is your security," and further assures that its "policies are designed to safeguard your personal information and financial data."[17] To protect its customers' personal information from unauthorized access and use, CUO purportedly "use[s] security measures that comply with applicable federal and state laws. These measures may include device safeguards and secured files and buildings as well as oversight of [CUO's] third party service providers to ensure information remains confidential and secure."[18]

---

[16] https://www.doxim.com/privacy-policy/ (last visited Dec. 5, 2024).
[17] *Security Center*, CREDIT UNION ONE, https://www.cuone.org/resources/helpful-links/security-center (last visited Dec. 5, 2024).
[18] *Privacy Statement*, Credit Union ONE (May 2023), https://www.cuone.org/getmedia/0027cd68-9ba6-4eb5-84b0-6cafdb7ca61c/5-23-23-

46. Beacon's privacy policy provides, among other things, "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[19]

47. AmeriCU, states on its website that it "respects your privacy and is committed to protecting your personal data."[20] AmeriCU further assures its customers that it has "put in place appropriate security measures to prevent your personal data from being accidentally lost, used or accessed in an unauthorized way, altered or disclosed."[21]

48. By obtaining, collecting, using, and deriving benefit from Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties to those persons, and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure and/or criminal cyber activity that would lead to readily foreseeable harm to Plaintiffs and the Class.

## III. JURISDICTION AND VENUE

49. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), *et seq*. The amount in controversy

---

Privacy-Notice-without-Opt-OUT-02100911-DXPS0-C-%201-050123-DXPS01-E-_CUF.pdf (last visited Dec. 5, 2024)

[19] https://www.beaconcu.org/privacy-notice/ (last visited Dec. 5, 2024).

[20] https://www.americu.org/privacy-policies/ (last visited Dec. 5, 2024).

[21] *Id.*

exceeds $5 million, exclusive of interest and costs. There are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

50. This Court has personal jurisdiction over Defendants because Doxim has a substantial presence in this District and, upon information and belief, is a citizen of a foreign state.

51. CUO is a citizen of Michigan, engaged in the conduct underlying this action in Michigan, including the collection, storage, and inadequate safeguarding of Plaintiffs' and Class Members' PII.

52. Beacon engaged in the conduct underlying this action in Michigan, including the collection and dissemination of Plaintiffs' and Class Members' PII to Michigan.

53. AmeriCU engaged in the conduct underlying this action in Michigan, including the collection and dissemination of Plaintiffs' and Class Members' PII to Michigan.

54. All Defendants did business in and had substantial contacts with the forum.

55. Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred in,

were directed to, and/or emanated from this District, and Doxim resides within this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. Background

56. In the ordinary course of its business practices, Defendants store, maintain, and use an individuals' PII, which includes that of Plaintiffs and Class Members, including but not limited to information such as:

a. Full names;

b. Personal home address;

c. Private financial account information; and

d. SSN;

57. Defendants understand the importance of securely storing and maintaining PII.

### B. The Data Breach

58. Defendants became aware of the Data Breach on or about December 30, 2023.[22]

59. Defendants then took steps to secure its systems and network including retaining independent cybersecurity experts to investigate the matter further but neglected to notify affected individuals of the Data Breach quickly and

---

[22] *See* n.1.

appropriately, first notifying some affected individuals on or about May 31, 2024, others not until on or about June 14, and still others on or about July 5, 2024.

60. Additionally, though Plaintiffs and the Class have an interest in ensuring that their information remains protected, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures taken by Defendants to ensure a data breach does not occur again, have not been shared with regulators, Plaintiffs, or members of the Class.

**C. Defendants Were Aware of the Data Breach Risks**

61. Considering recent high-profile data breaches at other companies in the financial industry, Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

62. The financial industry has endured over 20,000 cyberattacks in the past two decades, leading to losses exceeding $12 billion."[23] Additionally, the losses are most substantial and impactful at smaller financial institutions, likely due to their less robust data security systems.[24]

[23] Fabio Natalucci, *Rising Cyber Threats Pose Serious Concerns for Financial Stability*, IMF Blog (April 9, 2024), https://www.imf.org/en/Blogs/Articles/2024/04/09/rising-cyber-threats-pose-serious-concerns-for-financial-stability (last visited Dec. 5, 2024).
[24] *Id*.

63. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

64. Defendants had and continues to have obligations created by implied contract, industry standards, common law, and representations made to Plaintiffs and the Class, to keep their PII private and confidential and to protect it from unauthorized access, disclosure, or exfiltration.

65. Plaintiffs and the Class provided their PII to Defendants with the reasonable expectation that an entity such as Defendant, which is responsible for maintaining customer data, would comply with their obligations to employ reasonable care to keep such information confidential and secure from unauthorized access.

66. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and data breaches in the banking, credit, and financial service industries preceding the date of the Data Breach, particularly considering Defendants' role in that industry.

67. Indeed, data breaches, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant

risk of future attacks, was widely known and foreseeable to the public and to anyone in Defendants' industry, including Defendants.

68. According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take substantial time, money, and patience to resolve.[25] Identity thieves use the stolen PII for a variety of crimes, including but not limited to, credit card fraud, telephone or utilities fraud, and bank and finance fraud.[26]

69. The PII of Plaintiffs and the Class were accessed and taken by cyber criminals for the very purpose of engaging in illegal and unethical conduct, including crimes involving identity theft, fraud, or to otherwise profit by selling their data to other criminals who purchase PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

70. Defendants knew, or reasonably should have known, of the critical importance of safeguarding the Plaintiffs' and Class Members' PII, including their

---

[25] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf (last visited Dec. 5, 2024).

[26] *Id*. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

SSN and financial details. Defendants also knew, or should have known, the foreseeable consequences of a breach in their data security systems, which would specifically lead to significant costs and damages for the Plaintiffs and the Class.

71. Plaintiffs and the Class now face years of constant monitoring and surveillance of their financial and personal records. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII as a direct result of the Data Breach.

72. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' own failure to install, implement, or maintain adequate data security measures, software and other industry best practices for safeguarding the PII of Plaintiffs and the Class.

**D. Defendants Failed to Comply with FTC Guidelines**

73. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable and adequate data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

74. In 2022, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer

needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[27]

75. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

76. The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from

---

[27] Ritchie, J. N. & A., & Jayanti, S.F.-T. and A. (April 26, 2022). *Protecting personal information: A guide for business.* Federal Trade Commission. https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Dec. 5, 2024).

these actions further clarify the measures businesses must take to meet their data security obligations.

77. Defendants failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

78. To prevent and detect cyber-attacks, including the cyber-attack on Defendants' network that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government and FTC, the following measures:

a. Implement an awareness and training program, because end users are targets, employees and individuals should be aware of the threat of malware and how it is delivered;

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing;

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users;

d. Configure firewalls to block access to known malicious IP addresses;

e. Patch operating systems, software, and firmware on devices using a centralized patch management system;

f. Set anti-virus and anti-malware programs to automatically conduct regular scans and/or repairs;

g. Create and manage the use of privileged accounts based on the varying level of accessibility using a principle of least privilege wherein no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary, such as any internal IT employees;

h. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares;

i. Disable macro scripts from Microsoft Office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications;

j. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common malware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder;

k. Consider disabling Remote Desktop protocol (RDP) if it is not being used;

l. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy;

m. Execute operating system environments or specific programs in a virtualized environment; and

n. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

79. Defendants were at all times fully aware of their obligation to protect the PII of their customers, clients' customers, and prospective customers. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**E. Defendants Failed to Comply with Industry Standards**

80. A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendants' cybersecurity practices. Best cybersecurity practices that are standard in the financial services industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points of security.

81. Upon information and belief, Defendants failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established

standards in reasonable cybersecurity readiness. These frameworks are existing and applicable industry standards in Defendants' industry, and Defendants failed to comply with these accepted standards, thereby opening the door to the cyber-attack and causing the Data Breach.

82. The occurrence of the Data Breach is indicative that Defendants failed to adequately implement one or more of the above measures to prevent or circumvent ransomware attacks or other forms of malicious cybercrimes, resulting in the Data Breach.

**F. PII Holds Value to Cyber Criminals**

83. Businesses, such as Defendants, that store PII in their daily course of business are more likely to be targeted by cyber criminals. Credit card, routing, bank account and other financial numbers are highly sought data targets for hackers, but information such as date of birth, driver's license number, and SSN are even more desirable to cyber criminals; they are not easily destroyed or replaceable and can be easily used to perpetrate acts of identity theft and other types of fraud.

84. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web to obtain PII of other unknown individuals. Numerous sources cite dark web pricing for stolen identity credentials.

For example, PII can be sold at a price ranging from $40 to $200, and banking details have a price range of $50 to $200.[28]

85. A person's SSN, for example, is among the worst kind of PII to have stolen or otherwise compromised because they may be put to a variety of fraudulent uses and are difficult for an individual to change or otherwise repair once it's compromised. The Social Security Administration ("SSA") stresses that the loss of an individual's SSN, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems. [29]

86. What is more, it is no easy task to change or cancel a stolen or compromised SSN as is the case for several of the Class Members in this action. An individual cannot obtain a new SSN without significant time, monetary investment,

---

[28] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Dec. 5, 2024).

[29] *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Dec. 5, 2024).

paperwork, and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of an SSN is not permitted and the only form of remediation happens *after* the first incident of misuse; an individual must show evidence of actual, ongoing fraudulent activity to be eligible to submit an application requesting a new SSN with the SSA.

87. Furthermore, as the SSA warns:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[30]

88. Here, the unauthorized access by cyber criminals left them with the tools to perform the most thorough identity theft—they have obtained enough of the essential PII that can be used to mimic the identity of the victim. The PII of Plaintiffs

---

[30] *Id.*

and the Class stolen in the Data Breach constitutes a dream for hackers or cyber criminals and a nightmare for Plaintiffs and the Class. Stolen personal data of Plaintiffs and the Class represents essentially one-stop shopping for identity thieves indefinitely.

89. The FTC has released its updated publication on protecting PII for businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

90. General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[31]

91. Companies recognize that PII is a valuable asset and a valuable commodity, but also necessary throughout the typical course of business with

---

[31] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29.

consumers. A "cyber black-market" exists in which criminals openly post stolen SSN and other PII on several dark web Internet websites. The stolen PII of Plaintiffs and the Class has a high value on both legitimate and black markets.

92. Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

93. As noted above, the disclosure of SSN in particular poses a significant risk. Criminals can, for example, use SSNs to create false bank accounts or file fraudulent tax returns or other tax related forms and documents using an alias of their victim. Class Members whose SSN have been compromised in the Data Breach now face a real, present, imminent, and substantial risk of identity theft and other problems associated with the disclosure of their SSN and will need to monitor their credit and tax filings for an indefinite duration.

94. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, merely losing payment information in a retailer data breach, because those victims can file disputes, cancel or close credit and debit cards and/or accounts. The information

compromised in this Data Breach is impossible to "close" and difficult, if not nearly impossible, to change.

95. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[32]

96. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police or other emergency medical services. An individual may not know that their driver's license was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud, or until the individual attempts to lawfully apply for unemployment and is denied benefits (due to the prior, fraudulent application and award of benefits).

### G. Plaintiffs' and Class Members' Damages

97. Defendants have failed to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and the Class's PII.

---

[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

98. Plaintiffs and the Class have been damaged by the compromise of their PII in the Data Breach.

99. Plaintiffs and the Class presently face substantial risk of out-of-pocket fraud losses such as loans opened in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

100. Plaintiffs and the Class have been, and currently face substantial risk of being targeted now and in the future, for phishing schemes, data intrusion, and other illegality based on their PII being compromised in the Data Breach as potential fraudsters could use the information garnered to target such schemes more effectively against Plaintiffs and the Class.

101. Plaintiffs and the Class may also incur out-of-pocket costs for implementing protective measures such as purchasing credit monitoring fees, credit report fees, credit freeze fees, and other similar costs directly or indirectly related to the Data Breach.

102. Plaintiffs and the Class also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in data breach cases.

103. Plaintiffs and the Class have spent and will continue to spend significant amounts of uncompensated time to monitor their financial accounts, medical accounts, sensitive information, credit score, and records for misuse.

104. Plaintiffs and the Class have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach

105. Moreover, Plaintiffs and the Class have an interest in ensuring that their PII, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of proper and adequate security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password protected.

106. Further, because of Defendants' conduct, Plaintiffs and the Class are forced to live with the anxiety and fear that their PII —which contains the most intimate details about a person's life—may be disclosed to the entire world, whether physically or virtually, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

107. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and the Class have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm because of the Data Breach.

**1. Plaintiff Jonathan McKinley's Experience**

108. Plaintiff McKinley was a customer at Beacon Credit Union, which upon information and belief is a client of Doxim.

109. Plaintiff McKinley, through Beacon, entrusted his PII and other confidential information to Doxim with the reasonable expectation and understanding that Doxim and/or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify they of any data security incidents related to his PII. Plaintiff McKinley would not have allowed Beacon or Doxim to collect and maintain his PII had he known that they would not take reasonable steps to safeguard his PII.

110. Plaintiff McKinley received Doxim's Notice Letter on or about May 31, 2024. Upon information and belief, Defendants did not begin to notify Beacon Class Members that they were affected individuals until on or about May 31, 2024.

111. The Notice Letter advised Plaintiff McKinley that an unauthorized third party could have accessed his personal information.[33] This information included his name, address, financial account number, and SSN.[34]

[33] *See* Exhibit 2.
[34] *Id*.

112. Plaintiff McKinley has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls, researching the Data Breach, verifying the authenticity of the Notice Letter, exploring credit monitoring and identity theft insurance options, and self-monitoring his accounts. This is uncompensated time that has been lost forever and cannot be recaptured.

113. Since learning about the breach, Plaintiff McKinley has taken the necessary preventative measures in an effort to mitigate the risk of any potential instances of identity theft of fraud, to review financial statements and identity theft protection reports to preemptively detect and deter actual instances of identity theft or fraud.

114. Prior to this Data Breach, Plaintiff McKinley had taken steps to protect and safeguard his PII, including monitoring their PII closely. He has not knowingly transmitted his PII over unsecured or unencrypted internet connections. Plaintiff McKinley stores all documents containing his PII in a safe and secure location. Moreover, he diligently chooses unique usernames and passwords for the online accounts that he has.

115. Plaintiff McKinley has suffered actual injury in the form of damages to, and diminution in, the value of their PII – a form of intangible property that

Plaintiff McKinley entrusted to Beacon and Doxim. This PII was compromised in, and has been diminished as a result of, the Data Breach.

116. Plaintiff McKinley has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of his privacy and the substantial risk of fraud and identity theft which he now faces.

117. Plaintiff McKinley has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of his PII resulting from the compromise of his PII, especially his SSN, in combination with his name, which is now in the hands of cyber criminals and other unauthorized third parties.

118. Knowing that thieves stole his PII, including his SSN, and knowing that his PII will likely be sold on the dark web, has caused Plaintiff McKinley great anxiety.

119. Additionally, Plaintiff McKinley does not recall having been involved in any other data breaches in which his sensitive and confidential PII, such as his SSN, was compromised.

120. Plaintiff McKinley has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of Beacon and Doxim, is protected, and safeguarded from future data breaches.

121. As a result of the Data Breach, Plaintiff McKinley is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

**2. Plaintiff Bruce Narolis's Experience**

122. Plaintiff Narolis was a customer at Truliant Federal Credit Union, which, upon information and belief, is a client of Doxim.

123. Plaintiff Narolis, through Truliant, entrusted his PII and other confidential information to Doxim with the reasonable expectation and understanding that Doxim and/or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to his PII. Plaintiff Narolis would not have allowed Truliant and Doxim to collect and maintain his PII had he known that they would not take reasonable steps to safeguard his PII.

124. Plaintiff Narolis has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls to obtain more information about the Data Breach and researching the Data Breach. This is uncompensated time that has been lost forever and cannot be recaptured.

125. Since learning about the breach, Plaintiff Narolis has taken the necessary preventative measures in an effort to mitigate the risk of any potential instances of identity theft of fraud, to review financial statements and identity theft protection reports to preemptively detect and deter actual instances of identity theft or fraud.

126. Prior to this Data Breach, Plaintiff Narolis had taken steps to protect and safeguard his PII including monitoring their PII closely. He has not knowingly transmitted his PII over unsecured or unencrypted internet connections. Plaintiff Narolis stores all documents containing his PII in a safe and secure location. Moreover, he diligently chooses unique usernames and passwords for the online accounts that he has.

127. Plaintiff Narolis has suffered actual injury in the form of damages to, and diminution in, the value of his PII – a form of intangible property that Plaintiff Narolis entrusted to Doxim. This PII was compromised in, and has been diminished as a result of, the Data Breach.

128. Plaintiff Narolis has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of his privacy and the substantial risk of fraud and identity theft which he now faces.

129. Plaintiff Narolis has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of his PII resulting from the compromise of his PII, especially his SSN, in combination with his name, which is now in the hands of cyber criminals and other unauthorized third parties.

130. Knowing that thieves stole his PII, including his SSN, and knowing that his PII will likely be sold on the dark web, has caused Plaintiff Narolis great anxiety.

131. Plaintiff Narolis has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of Truliant and Doxim, is protected, and safeguarded from future data breaches.

132. As a result of the Data Breach, Plaintiff Narolis is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

**3. Plaintiff Rose McNichols's Experience**

133. Plaintiff McNichols was a customer at St. Louis Community Credit Union ("SLCCU"), which upon information and belief is a client of Doxim.

134. Plaintiff McNichols, through her credit union SLCCU, entrusted her PII and other confidential information to Doxim and SLCCU with the reasonable expectation and understanding that Doxim and SLCCU and/or their agents, would take industry-standard precautions to protect, maintain, and safeguard that

information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to her PII. Plaintiff McNichols would not have allowed Doxim and SLCCU to collect and maintain her PII had she known that Defendants would not take reasonable steps to safeguard her PII.

135. Plaintiff McNichols received a Notice Letter from Doxim, dated June 14, 2024, detailing that, as a member of SLCCU, her data had been compromised.[35] The Notice Letter advised that files containing her PII, including her name, account number and SSN, had been removed from Doxim's network as part of the Data Breach.[36]

136. Plaintiff McNichols has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls to obtain more information about the Data Breach and researching the Data Breach. This is uncompensated time that has been lost forever and cannot be recaptured.

137. Since learning about the breach, Plaintiff McNichols has taken the necessary preventative measures in an effort to mitigate the risk of any potential instances of identity theft of fraud, to review financial statements and identity theft

[35] Exhibit 2.

[36] *Id.*

protection reports to preemptively detect and deter actual instances of identity theft or fraud.

138. Prior to this Data Breach, Plaintiff McNichols had taken steps to protect and safeguard her PII, including monitoring her PII closely. She has not knowingly transmitted her PII over unsecured or unencrypted internet connections. Plaintiff McNichols stores all documents containing her PII in a safe and secure location. Moreover, she diligently chooses unique usernames and passwords for the online accounts that she has.

139. Plaintiff McNichols has suffered actual injury in the form of damages to, and diminution in, the value of her PII – a form of intangible property that Plaintiff McNichols entrusted to Doxim and SLCCU. This PII was compromised in, and has been diminished as a result of, the Data Breach.

140. Plaintiff McNichols has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of her privacy and the substantial risk of fraud and identity theft which she now faces.

141. Plaintiff McNichols has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of her PII resulting from the compromise of her PII, especially her SSN, in combination

with her name, address and date of birth, which is now in the hands of cyber criminals and other unauthorized third parties.

142. Knowing that thieves stole her PII, including her SSN, and knowing that her PII will likely be sold on the dark web, has caused Plaintiff McNichols great anxiety.

143. Plaintiff McNichols has a continuing interest in ensuring that her PII which, upon information and belief, remains in the possession of Doxim and SLCCU, is protected, and safeguarded from future data breaches.

144. As a result of the Data Breach, Plaintiff McNichols is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

**4. Plaintiff Alex Poplawski's Experience**

145. Plaintiff Poplawski is a customer at AmeriCU Credit Union, who upon information and belief is a client of Doxim.

146. Plaintiff Poplawski, through his credit union, AmeriCU, entrusted his PII and other confidential information to Doxim with the reasonable expectation and understanding that Doxim and/or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to his PII. Plaintiff Poplawski would not have allowed Doxim and AmeriCU

to collect and maintain his PII had he known that they would not take reasonable steps to safeguard his PII.

147. Plaintiff Poplawski received Doxim's Notice Letter on or about June 14, 2024, from Doxim.[37] The Notice advised Plaintiff Poplawski that an unauthorized third party could have accessed his personal information.[38] This information included his name, address, financial account number, and SSN.[39]

148. Plaintiff Poplawski has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls to obtain more information about the Data Breach and researching the Data Breach. This is uncompensated time that has been lost forever and cannot be recaptured.

149. Since learning about the breach, Plaintiff Poplawski has taken the necessary preventative measures in an effort to mitigate the risk of any potential instances of identity theft of fraud, to review financial statements and identity theft protection reports to preemptively detect and deter actual instances of identity theft or fraud.

150. Prior to this Data Breach, Plaintiff Poplawski had taken steps to protect and safeguard his PII including monitoring their PII closely. He has not knowingly

[37] Exhibit 2.
[38] *Id.*
[39] *Id.*

transmitted his PII over unsecured or unencrypted internet connections. Plaintiff Poplawski stores all documents containing his PII in a safe and secure location. Moreover, he diligently chooses unique usernames and passwords for the online accounts that he has.

151. As a result of the Data Breach, Plaintiff Poplawski has been subscribed to websites for which he never signed up.

152. As a result of the Data Breach, Plaintiff Poplawski's Pay Pal account was charged over $100 for an unauthorized use.

153. Plaintiff Poplawski has suffered actual injury in the form of damages to, and diminution in, the value of his PII – a form of intangible property that Plaintiff Poplawski entrusted to Doxim and AmeriCU. This PII was compromised in, and has been diminished as a result of, the Data Breach.

154. Plaintiff Poplawski has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of his privacy and the substantial risk of fraud and identity theft which he now faces.

155. Plaintiff Poplawski has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of his PII resulting from the compromise of his PII, especially his SSN, in combination with

his name, which is now in the hands of cyber criminals and other unauthorized third parties.

156. Knowing that thieves stole his PII, including his SSN, and knowing that his PII will likely be sold on the dark web, has caused Plaintiff Poplawski great anxiety.

157. Plaintiff Poplawski has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of Doxim and AmeriCU, is protected, and safeguarded from future data breaches.

158. As a result of the Data Breach, Plaintiff Poplawski is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

**5. Plaintiff Brian Satterwhite's Experience**

159. Plaintiff Satterwhite is a customer of Zeal Credit Union, who upon information and belief is a client of Doxim.

160. Plaintiff Satterwhite, through his credit union Zeal, entrusted his PII and other confidential information to Doxim with the reasonable expectation and understanding that Doxim and/or their agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to his PII. Plaintiff Satterwhite would not have allowed Doxim to collect and

maintain his PII had he known that Doxim would not take reasonable steps to safeguard his PII.

161. Plaintiff Satterwhite received a Notice Letter from Doxim dated July 5, 2024, detailing that, as a member of Zeal, his data had been compromised.[40] The Notice Letter advised that files containing Plaintiff's PII, including his name, account number and SSN, had been removed from Doxim's network as part of the Data Breach.[41]

162. Plaintiff Satterwhite has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls to obtain more information about the Data Breach and researching the Data Breach. This is uncompensated time that has been lost forever and cannot be recaptured.

163. Since learning about the breach, Plaintiff Satterwhite has taken the necessary preventative measures in an effort to mitigate the risk of any potential instances of identity theft of fraud, to review financial statements and identity theft protection reports to preemptively detect and deter actual instances of identity theft or fraud.

[40] Exhibit 2.
[41] *Id.*

164. Prior to this Data Breach, Plaintiff Satterwhite had taken steps to protect and safeguard his PII including monitoring her PII closely. He has not knowingly transmitted his PII over unsecured or unencrypted internet connections. Plaintiff Satterwhite stores all documents containing his PII in a safe and secure location. Moreover, he diligently chooses unique usernames and passwords for the online accounts that he has.

165. Plaintiff Satterwhite has suffered actual injury in the form of damages to, and diminution in, the value of his PII – a form of intangible property that Plaintiff Satterwhite entrusted to Doxim. This PII was compromised in, and has been diminished as a result of, the Data Breach.

166. Plaintiff Satterwhite has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of his privacy and the substantial risk of fraud and identity theft which he now faces.

167. Plaintiff Satterwhite has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of his PII resulting from the compromise of his PII, especially his SSN, in combination with his name, which is now in the hands of cyber criminals and other unauthorized third parties.

168. Knowing that thieves stole his PII, including his SSN, and knowing that his PII will likely be sold on the dark web, has caused Plaintiff Satterwhite great anxiety.

169. Plaintiff Satterwhite has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Doxim, is protected, and safeguarded from future data breaches.

170. As a result of the Data Breach, Plaintiff Satterwhite is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

**6. Plaintiff Thomas Wardrop's Experience**

171. Plaintiff Wardrop is former customer of CUO, who upon information and belief is a client of Doxim.

172. Plaintiff Wardrop, through his credit union CUO, entrusted his PII and other confidential information to CUO and Doxim with the reasonable expectation and understanding that CUO and Doxim and/or their agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to his PII. Plaintiff Wardrop would not have allowed Doxim and CUO to collect and maintain his PII had he known that Doxim and CUO would not take reasonable steps to safeguard his PII.

173. Plaintiff Wardrop received a Notice Letter from Doxim dated May 31, 2024, detailing that, as a member of CUO, his data had been compromised.[42] The Notice Letter advised that files containing Plaintiff's PII, including his name, account number and SSN, had been removed from Doxim's network as part of the Data Breach.[43]

174. Plaintiff Wardrop has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls to obtain more information about the Data Breach and researching the Data Breach. This is uncompensated time that has been lost forever and cannot be recaptured.

175. Since learning about the breach, Plaintiff Wardrop has taken the necessary preventative measures in an effort to mitigate the risk of any potential instances of identity theft of fraud, to review financial statements and identity theft protection reports to preemptively detect and deter actual instances of identity theft or fraud.

176. Prior to this Data Breach, Plaintiff Wardrop had taken steps to protect and safeguard his PII including monitoring her PII closely. He has not knowingly transmitted his PII over unsecured or unencrypted internet connections. Plaintiff

[42] Exhibit 1, Notice.
[43] *Id.*

Wardrop stores all documents containing his PII in a safe and secure location. Moreover, he diligently chooses unique usernames and passwords for the online accounts that he has.

177. Plaintiff Wardrop has suffered actual injury in the form of damages to, and diminution in, the value of his PII – a form of intangible property that Plaintiff Wardrop entrusted to CUO and Doxim. This PII was compromised in, and has been diminished as a result of, the Data Breach.

178. Plaintiff Wardrop has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of his privacy and the substantial risk of fraud and identity theft which he now faces.

179. Plaintiff Wardrop has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of his PII resulting from the compromise of his PII, especially his SSN, in combination with his name, which is now in the hands of cyber criminals and other unauthorized third parties.

180. Knowing that thieves stole his PII, including his SSN, and knowing that his PII will likely be sold on the dark web, has caused Plaintiff Wardrop great anxiety.

181. Plaintiff Wardrop has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of CUO and Doxim, is protected, and safeguarded from future data breaches.

182. As a result of the Data Breach, Plaintiff Wardrop is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

## V. CLASS ACTION ALLEGATIONS

183. Plaintiffs bring this nationwide class action according to Federal Rules of Civil Procedure, Rules 23(b)(2), 23(b)(3), and 23(c)(4).

184. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All persons residing in the United States whose PII was compromised during the Data Breach that is the subject of the Notice Letter ("Class").

185. Plaintiff Wardrop seeks to represent a CUO Subclass defined as:

> All persons residing in the United States who are or were customers of Credit Union One whose PII was compromised during the Data Breach that is the subject of the Notice Letter ("CUO Subclass").

186. Plaintiff McKinley seeks to represent a Beacon Subclass defined as:

> All persons residing in the United States who are or were customers of Beacon Credit Union whose PII was compromised during the Data Breach that is the subject of the Notice Letter ("Beacon Subclass").

187. Plaintiff Poplawski seeks to represent an AmeriCU Subclass defined as:

> All persons residing in the United States who are or were customers of AmeriCU Credit Union whose PII was compromised during the Data Breach that is the subject of the Notice Letter ("AmeriCU Subclass").

188. Excluded from the Class are: (i) Defendants and their employees, officers, directors, affiliates, parents, subsidiaries, and any entity in which a Defendants have a whole or partial ownership of financial interest; (ii) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (iii) any counsel and their respective staff appearing in this matter; and (iv) all judges assigned to hear any aspect of this litigation, their immediate family members, and their respective court staff.

189. Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

190. **Numerosity**. The Class is so numerous that joinder of all members is impracticable. The Class likely includes, at the least, thousands of individuals whose personal data was compromised by the Data Breach. The exact number of Class Members is in the possession and control of Defendants and will be ascertainable through discovery.

191. **Commonality.** There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any questions that may affect only individual Class Members, including, without limitation:

a. Whether Defendants unlawfully maintained, lost or disclosed Plaintiffs' and the Class's PII;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Class to safeguard their PII;

f. Whether Defendants breached duties to Class to safeguard their PII;

g. Whether cyber criminals obtained the Class's PII in the Data Breach;

h. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

i. Whether Defendants owed a duty to provide Plaintiffs and Class timely notice of this Data Breach, and whether Defendants breached that duty;

j. Whether Plaintiffs and Class suffered legally cognizable damages as a result of Defendants' misconduct;

k. Whether Defendants' conduct was negligent;

l. Whether Defendants' conduct violated federal law;

m. Whether Defendants' conduct violated state law; and

n. Whether Plaintiffs and Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

192. **Typicality**. Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all proposed Class Members, had their PII compromised, breached, or otherwise stolen in the Data Breach. Plaintiffs and the Class were injured through the uniform misconduct of Defendants, described throughout this Complaint, and assert the same claims for relief.

193. **Adequacy**. Plaintiffs and counsel will fairly and adequately protect the interests of Plaintiffs and the proposed Class. Plaintiffs retained counsel who are experienced in Class action and complex litigation, particularly those involving Data Breach as is at issue in this Complaint. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of other Class Members.

194. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class Members would find the cost of litigating their claims prohibitively high and would therefore have no effective remedy, so that in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Plaintiffs and the Class have been harmed by Defendants' wrongful conduct and/or action. Litigating this action as a class action will reduce the possibility of repetitious litigation relating to Defendants' conduct and/or

inaction. Plaintiffs know of no difficulties that would be encountered in this litigation that would preclude its maintenance as a class action.

195. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action conserves judicial resources and the parties' resources and protects the rights of each member of the Class. Specifically, injunctive relief could be entered in multiple cases, but the ordered relief may vary, causing Defendants to have to choose between differing means of upgrading data security infrastructure and choosing the court order with which to comply. Class action status is also warranted because prosecution of separate actions by Class Members would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

196. Class certification, therefore, is appropriate under Rule 23(a) and (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

197. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty or obligation to Plaintiffs and the Class to exercise due care in collecting, storing, using, safeguarding, or otherwise maintaining their PII;

b. Whether Defendants breached a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, using, safeguarding, or otherwise maintaining their PII;

c. Whether Defendants failed to comply with their own policies or procedures and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e. Whether Plaintiffs and the Class are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

## VI. CAUSES OF ACTION

### <u>COUNT I</u>
### Negligence
### (On behalf of Plaintiffs and the Nationwide Class against Doxim)

198. Plaintiffs and the Class reallege and incorporate all foregoing paragraphs.

199. Plaintiffs and the Class, through their financial institutions or other clients of Doxim, entrusted Doxim with their PII.

200. Plaintiffs and the Class entrusted their PII to Doxim on the premise and with the understanding that Doxim would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties. Had Plaintiffs and the Class known their PII would not be protected, they would not have allowed Doxim to possess it.

201. Doxim owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, using, maintaining, and protecting their PII from unauthorized third parties.

202. The legal duties owed by Doxim to Plaintiffs and the Class include, but are not limited to the following:

a. To exercise reasonable care in procuring, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiffs and the Class in Doxim's possession;

b. To protect PII of Plaintiffs and the Class in Doxim's possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

c. To implement processes and software to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Class of the Data Breach.

203. Doxim's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by companies like Defendants of failing to use reasonable measures to protect PII.

204. Various FTC publications and data security breach orders further form the basis of Doxim's duty. Plaintiffs and Class are consumers under the FTC Act. Doxim violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

205. Doxim breached its duties to Plaintiffs and the Class. Doxim knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems, especially in light of the fact that data breaches have recently been prevalent.

206. Doxim knew or should have known that its security practices did not adequately safeguard the PII of Plaintiffs and the Class.

207. Through Doxim's acts and omissions described in this Complaint, including Doxim's failure to provide adequate security measures and its failure to protect the PII of Plaintiffs and the Class from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, Doxim unlawfully breached its duty to

use reasonable care to adequately protect and secure the PII of Plaintiffs and the Class during the period it was within Doxim's possession and control.

208. Doxim's duty to use reasonable security measures arose as a result of the special relationship that existed between Doxim and Plaintiffs and the Class. That special relationship arose because Doxim was entrusted with Plaintiffs' and Class Members' confidential PII.

209. Doxim was subject to an "independent duty," untethered to any contract between Doxim and Plaintiffs and the Class.

210. Doxim's own conduct created a foreseeable risk of harm to an individual, including Plaintiffs and the Class. Doxim's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Doxim's misconduct also included its decision not to comply with industry standards for safekeeping of the PII of Plaintiffs and the Class, including basic encryption techniques freely available to Doxim.

211. Doxim was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

212. Doxim had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Class.

213. Doxim breached the duties it owes to Plaintiffs and Class in several ways, including:

a. Failing to implement adequate security systems, protocols, and practices sufficient to protect customers' PII and thereby creating a foreseeable risk of harm;

b. Failing to comply with the minimum industry data security standards during the period of the Data Breach;

c. Failing to act despite knowing or having reason to know that its systems were vulnerable to attack; and

d. Failing to timely and accurately disclose to customers that their PII had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

214. There is a close causal connection between Doxim's failure to implement security measures to protect the PII of Plaintiffs and Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was stolen and accessed as the proximate result of Doxim's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

215. Due to Doxim's misconduct, Plaintiffs and the Class are entitled to credit monitoring at a minimum. The PII taken in the Data Breach can be used for identity theft and other types of financial fraud against Plaintiffs and the Class.

216. Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach.

217. As a result of Doxim's negligence, Plaintiffs and the Class suffered injuries that include:

i. the lost or diminished value of PII;

ii. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

iii. lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account;

iv. the continued risk to their PII, which may remain for sale on the dark web and is in Doxim's possession and subject to further unauthorized disclosures so long as Doxim fails to undertake appropriate and adequate measures to protect the PII in their continued possession;

v. future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and the Class, including ongoing credit monitoring.

218. These injuries were reasonably foreseeable given the history and uptick of data security breaches of this nature within the financial sector. The injury and harm that Plaintiffs and the Class suffered was the direct and proximate result of Doxim's negligent conduct.

**COUNT II**
**Negligence**
**(On behalf of Plaintiff Wardrop and the CUO Subclass against CUO)**

219. Plaintiff Wardrop and the CUO Subclass reallege and incorporate all foregoing paragraphs.

220. Plaintiff Wardrop and the CUO Subclass, through CUO, entrusted Doxim with their PII.

221. Plaintiff Wardrop and the CUO Subclass entrusted their PII to Doxim through CUO on the premise and with the understanding that CUO and Doxim would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties. Had Plaintiff Wardrop and the CUO Subclass known their PII would not be protected, they would not have allowed CUO and Doxim to possess it.

222. CUO owed a duty to Plaintiff Wardrop and the CUO Subclass to exercise reasonable care in obtaining, using, maintaining, and protecting their PII from unauthorized third parties.

223. The legal duties owed by CUO to Plaintiff Wardrop and the CUO Subclass include, but are not limited to the following:

d. To exercise reasonable care in procuring, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiff Wardrop and the CUO Subclass in CUO's and Doxim's possession;

e. To protect PII of Plaintiff Wardrop and the CUO Subclass in CUO's and Doxim's possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

f. To implement processes and software to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiff Wardrop and the CUO Subclass of the Data Breach.

224. CUO's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by companies like CUO of failing to use reasonable measures to protect PII.

225. Various FTC publications and data security breach orders further form the basis of CUO's duty. Plaintiff Wardrop and the CUO Subclass are consumers under the FTC Act. CUO violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

226. CUO breached its duties to Plaintiff Wardrop and the CUO Subclass. CUO knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems, especially in light of the fact that data breaches have recently been prevalent.

227. Plaintiff Wardrop and the CUO Subclass knew or should have known that the security practices of CUO and Doxim did not adequately safeguard the PII of Plaintiff Wardrop and the CUO Subclass.

228. Through CUO's acts and omissions described in this Complaint, including CUO's and Doxim's failure to provide adequate security measures and its failure to protect the PII of Plaintiff Wardrop and the CUO subclass from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, CUO

unlawfully breached its duty to use reasonable care to adequately protect and secure the PII of Plaintiff Wardrop and the CUO subclass during the period it was within CUO's and Doxim's possession and control.

229. CUO's duty to use reasonable security measures arose as a result of the special relationship that existed between CUO and Plaintiff Wardrop and the CUO Subclass. That special relationship arose because CUO was entrusted with Plaintiff Wardrop and the CUO Subclass's confidential PII.

230. CUO was subject to an "independent duty," untethered to any contract between CUO and Plaintiff Wardrop and the CUO Subclass.

231. CUO's own conduct created a foreseeable risk of harm to an individual, including Plaintiff Wardrop and the CUO Subclass. CUO's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. CUO's misconduct also included the decision not to ensure compliance with industry standards for safekeeping of the PII of Plaintiff Wardrop and the CUO Subclass, including basic encryption techniques freely available to CUO.

232. CUO was in a position to protect against the harm suffered by Plaintiff Wardrop and the CUO Subclass as a result of the Data Breach.

233. CUO had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff Wardrop and the CUO Subclass.

234. CUO breached the duties it owes to Plaintiff Wardrop and the CUO Subclass in several ways, including:

a. Failing to implement adequate security systems, protocols, and practices sufficient to protect customers' PII and thereby creating a foreseeable risk of harm;

b. Failing to comply with the minimum industry data security standards during the period of the Data Breach;

c. Failing to act despite knowing or having reason to know that its systems were vulnerable to attack; and

d. Failing to timely and accurately disclose to customers that their PII had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

235. There is a close causal connection between CUO's failure to implement security measures to protect the PII of Plaintiff Wardrop and the CUO Subclass and the harm, or risk of imminent harm, suffered by Plaintiff Wardrop and the CUO Subclass. The PII of Plaintiff Wardrop and the CUO Subclass was stolen and accessed as the proximate result of CUO's failure to exercise reasonable care in safeguarding PII by ensuring the adopting, implementing, and maintaining of appropriate security measures.

236. Due to CUO's misconduct, Plaintiff Wardrop and the CUO Subclass are entitled to credit monitoring at a minimum. The PII taken in the Data Breach can be used for identity theft and other types of financial fraud against Plaintiff Wardrop and the CUO Subclass.

237. Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach.

238. As a result of CUO's negligence, Plaintiff Wardrop and the CUO Subclass suffered injuries that include:

i. the lost or diminished value of PII;

ii. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

iii. lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account;

iv. the continued risk to their PII, which may remain for sale on the dark web and is in CUO's and Doxim's possession and subject to further unauthorized disclosures so long as CUO and Doxim fail to undertake appropriate and adequate measures to protect the PII in their continued possession;

v. future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff Wardrop and the CUO Subclass, including ongoing credit monitoring.

239. These injuries were reasonably foreseeable given the history and uptick of data security breaches of this nature within the financial sector. The injury and harm that Plaintiff Wardrop and the CUO Subclass suffered was the direct and proximate result of CUO's negligent conduct.

**COUNT III**
**Negligence**
**(On behalf of Plaintiff McKinley and the Beacon Subclass against Beacon)**

240. Plaintiff McKinley and the Beacon Subclass reallege and incorporate all foregoing paragraphs.

241. Plaintiff McKinley and the Beacon Subclass, through Beacon, entrusted Doxim with their PII.

242. Plaintiff McKinley and the Beacon Subclass entrusted their PII to Doxim through Beacon on the premise and with the understanding that CUO and Doxim would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties. Had Plaintiff McKinley and the Beacon Subclass known their PII would not be protected, they would not have allowed Beacon and Doxim to possess it.

243. Beacon owed a duty to Plaintiff McKinley and the Beacon Subclass to exercise reasonable care in obtaining, using, maintaining, and protecting their PII from unauthorized third parties.

244. The legal duties owed by Beacon to Plaintiff McKinley and the Beacon Subclass include, but are not limited to the following:

g. To exercise reasonable care in procuring, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiff McKinley and the Beacon Subclass in Beacon's and Doxim's possession;

h. To protect PII of Plaintiff McKinley and the Beacon Subclass in Beacon's and Doxim's possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

i. To implement processes and software to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiff McKinley and the Beacon Subclass of the Data Breach.

245. Beacon's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by companies like Beacon of failing to use reasonable measures to protect PII.

246. Various FTC publications and data security breach orders further form the basis of Beacon's duty. Plaintiff McKinley and the Beacon Subclass are consumers under the FTC Act. Beacon violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

247. Beacon breached its duties to Plaintiff McKinley and the Beacon Subclass. Beacon knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems, especially in light of the fact that data breaches have recently been prevalent.

248. Plaintiff McKinley and he Beacon Subclass knew or should have known that the security practices of Beacon and Doxim did not adequately safeguard the PII of Plaintiff McKinley and the Beacon Subclass.

249. Through Beacon's acts and omissions described in this Complaint, including Beacon's and Doxim's failure to provide adequate security measures and its failure to protect the PII of Plaintiff McKinley and the Beacon Subclass from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, Beacon unlawfully breached its duty to use reasonable care to adequately protect and secure the PII of Plaintiff McKinley and the Beacon Subclass during the period it was within Beacon's and Doxim's possession and control.

250. Beacon's duty to use reasonable security measures arose as a result of the special relationship that existed between Beacon and Plaintiff McKinley and the Beacon Subclass. That special relationship arose because Beacon was entrusted with Plaintiff McKinley and the Beacon Subclass's confidential PII.

251. Beacon was subject to an "independent duty," untethered to any contract between Beacon and Plaintiff McKinley and the Beacon Subclass.

252. Beacon's own conduct created a foreseeable risk of harm to an individual, including Plaintiff McKinley and the Beacon Subclass. Beacon's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Beacon's misconduct

also included the decision not to ensure compliance with industry standards for safekeeping of the PII of Plaintiff McKinley and the Beacon Subclass, including basic encryption techniques freely available to Beacon.

253. Beacon was in a position to protect against the harm suffered by Plaintiff McKinley and the Beacon Subclass as a result of the Data Breach.

254. Beacon had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff McKinley and the Beacon Subclass.

255. Beacon breached the duties it owes to Plaintiff McKinley and the Beacon Subclass in several ways, including:

a. Failing to implement adequate security systems, protocols, and practices sufficient to protect customers' PII and thereby creating a foreseeable risk of harm;

b. Failing to comply with the minimum industry data security standards during the period of the Data Breach;

c. Failing to act despite knowing or having reason to know that its systems were vulnerable to attack; and

d. Failing to timely and accurately disclose to customers that their PII had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

256. There is a close causal connection between Beacon's failure to implement security measures to protect the PII of Plaintiff McKinley and the Beacon Subclass and the harm, or risk of imminent harm, suffered by the Beacon Subclass.

The PII of Plaintiff McKinley and the Beacon Subclass was stolen and accessed as the proximate result of Beacon's failure to exercise reasonable care in safeguarding PII by ensuring the adopting, implementing, and maintaining of appropriate security measures.

257. Due to Beacon's misconduct, Plaintiff McKinley and the Beacon Subclass are entitled to credit monitoring at a minimum. The PII taken in the Data Breach can be used for identity theft and other types of financial fraud against Plaintiff McKinley and the Beacon Subclass.

258. Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach.

259. As a result of Beacon's negligence, Plaintiff McKinley and the Beacon Subclass suffered injuries that include:

i. the lost or diminished value of PII;

ii. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

iii. lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account;

iv. the continued risk to their PII, which may remain for sale on the dark web and is in Beacon's and Doxim's possession and subject to further unauthorized disclosures so long as Beacon and Doxim fail to undertake appropriate and

adequate measures to protect the PII in their continued possession;

v. future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff McKinley and the Beacon Subclass, including ongoing credit monitoring.

260. These injuries were reasonably foreseeable given the history and uptick of data security breaches of this nature within the financial sector. The injury and harm that Plaintiff McKinley and the Beacon Subclass suffered was the direct and proximate result of Beacon's negligent conduct.

**COUNT IV**
**Negligence**
**(On behalf of Plaintiff Poplawski and the AmeriCU Subclass Aagainst AmeriCU)**

261. Plaintiff Poplawski and the AmeriCU Subclass reallege and incorporate all foregoing paragraphs.

262. Plaintiff Poplawski and the AmeriCU Subclass, through AmeriCU, entrusted Doxim with their PII.

263. Plaintiff Poplawski and the AmeriCU Subclass entrusted their PII to Doxim through AmeriCU on the premise and with the understanding that AmeriCU and Doxim would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties. Had Plaintiff Poplawski

and the AmeriCU Subclass known their PII would not be protected, they would not have allowed AmeriCU and Doxim to possess it.

264. AmeriCU owed a duty to Plaintiff Poplawski and the AmeriCU Subclass to exercise reasonable care in obtaining, using, maintaining, and protecting their PII from unauthorized third parties.

265. The legal duties owed by AmeriCU to Plaintiff Poplawski and the AmeriCU Subclass include, but are not limited to the following:

j. To exercise reasonable care in procuring, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiff Poplawski and the AmeriCU Subclass in AmeriCU's and Doxim's possession;

k. To protect PII of Plaintiff Poplawski and the AmeriCU Subclass in AmeriCU's and Doxim's possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

l. To implement processes and software to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiff Poplawski and the AmeriCU Subclass of the Data Breach.

266. AmeriCU's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by companies like AmeriCU of failing to use reasonable measures to protect PII.

267. Various FTC publications and data security breach orders further form the basis of AmeriCU's duty. Plaintiff Poplawski and the AmeriCU Subclass are consumers under the FTC Act. AmeriCU violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

268. AmeriCU breached its duties to Plaintiff Poplawski and the AmeriCU Subclass. AmeriCU knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems, especially in light of the fact that data breaches have recently been prevalent.

269. Plaintiff Poplawski and the AmeriCU Subclass knew or should have known that the security practices of AmeriCU and Doxim did not adequately safeguard the PII of Plaintiff Poplawski and the AmeriCU Subclass.

270. Through AmeriCU's acts and omissions described in this Complaint, including AmeriCU's and Doxim's failure to provide adequate security measures and its failure to protect the PII of Plaintiff Poplawski and the AmeriCU Subclass from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, AmeriCU unlawfully breached its duty to use reasonable care to adequately protect and secure the PII of Plaintiff Poplawski and the AmeriCU Subclass during the period it was within AmeriCU's and Doxim's possession and control.

271. AmeriCU's duty to use reasonable security measures arose as a result of the special relationship that existed between AmeriCU and Plaintiff Poplawski and the AmeriCU Subclass. That special relationship arose because AmeriCU was entrusted with Plaintiff Poplawski and the AmeriCU Subclass's confidential PII.

272. AmeriCU was subject to an "independent duty," untethered to any contract between AmeriCU and Plaintiff Poplawski and the AmeriCU Subclass.

273. AmeriCU's own conduct created a foreseeable risk of harm to an individual, including the AmeriCU Subclass. AmeriCU's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. AmeriCU's misconduct also included the decision not to ensure compliance with industry standards for safekeeping of the PII of Plaintiff Poplawski and the AmeriCU Subclass, including basic encryption techniques freely available to AmeriCU.

274. AmeriCU was in a position to protect against the harm suffered by Plaintiff Poplawski and the AmeriCU Subclass as a result of the Data Breach.

275. AmeriCU had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff Poplawski and the AmeriCU Subclass.

276. AmeriCU breached the duties it owes to Plaintiff Poplawski and the AmeriCU Subclass in several ways, including:

a. Failing to implement adequate security systems, protocols, and practices sufficient to protect customers' PII and thereby creating a foreseeable risk of harm;

b. Failing to comply with the minimum industry data security standards during the period of the Data Breach;

c. Failing to act despite knowing or having reason to know that its systems were vulnerable to attack; and

d. Failing to timely and accurately disclose to customers that their PII had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

277. There is a close causal connection between AmeriCU's failure to implement security measures to protect the PII of Plaintiff Poplawski and the AmeriCU Subclass and the harm, or risk of imminent harm, suffered by Plaintiff Poplawski and the AmeriCU Subclass. The PII of Plaintiff Poplawski and the AmeriCU Subclass was stolen and accessed as the proximate result of AmeriCU's failure to exercise reasonable care in safeguarding PII by ensuring the adopting, implementing, and maintaining of appropriate security measures.

278. Due to AmeriCU's misconduct, Plaintiff Poplawski and the AmeriCU Subclass are entitled to credit monitoring at a minimum. The PII taken in the Data Breach can be used for identity theft and other types of financial fraud against Plaintiff Poplawski and the AmeriCU Subclass.

279. Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach.

280. As a result of AmeriCU's negligence, Plaintiff Poplawski and the AmeriCU Subclass suffered injuries that include:

i. the lost or diminished value of PII;

ii. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

iii. lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account;

iv. the continued risk to their PII, which may remain for sale on the dark web and is in AmeriCU's and Doxim's possession and subject to further unauthorized disclosures so long as AmeriCU and Doxim fail to undertake appropriate and adequate measures to protect the PII in their continued possession;

v. future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff Poplawski and the AmeriCU Subclass, including ongoing credit monitoring.

281. These injuries were reasonably foreseeable given the history and uptick of data security breaches of this nature within the financial sector. The injury and harm that Plaintiff Poplawski and the AmeriCU Subclass suffered was the direct and proximate result of AmeriCU's negligent conduct.

**COUNT V**
**Negligence *Per Se***
**(On behalf of Plaintiffs and the Nationwide Class)**

282. Plaintiffs and the Class reallege and incorporate all foregoing paragraphs.

283. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Doxim's duty in this regard.

284. Doxim violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and comply with applicable industry standards. Doxim's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable harm.

285. Doxim's violations of Section 5 of the FTC Act constitute negligence *per se*.

286. Plaintiffs and the Class are within the class of persons that the FTCA is intended to protect.

287. The harm that occurred as a result of the Data Breach is the type of harm the FTCA is intended to guard against. The FTC has pursued enforcement actions against businesses, which, because of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

288. As a direct and proximate result of Doxim's negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual instances of identity theft or fraud; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud, identity theft; and/or other various forms of fraud (v) costs associated with placing or removing freezes on credit reports; (vi) the continued risk to their PII, which remains in Doxim's possession and is subject to further unauthorized disclosures so long as Doxim fails to undertake appropriate and adequate measures to protect the PII of its current and former customers in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

289. Additionally, as a direct and proximate result of Doxim's negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Doxim's possession and is subject to further

unauthorized disclosures so long as Doxim fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

290. As a direct and proximate result of Doxim's negligence *per se*, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

**COUNT VI**
**Unjust Enrichment**
**(On behalf of Plaintiffs and the Nationwide Class)**

291. Plaintiffs and the Nationwide Class reallege and incorporate all foregoing paragraphs.

292. This claim is brought in the alternative to Plaintiffs' breach of contact claims below.

293. Plaintiffs and the Class conferred a monetary benefit to Defendants by providing them with their valuable PII, by permitting them access to their PII so that it could earn revenue by maintaining and utilizing Plaintiffs and Class Members' PII, which Defendants knowingly used or retained in the course of its business.

294. Defendants benefited from receiving Plaintiffs' and the Class Members' PII by their ability to retain and use that information for their own financial business benefit. Defendants understood this benefit and accepted the benefit knowingly.

295. Defendants also understood and appreciated that the PII of Plaintiffs and the Class was private and confidential to them, and that its value depended upon Defendants maintaining the privacy and confidentiality of that PII.

296. Plaintiffs and the Class would not have permitted Defendants to have access to their PII without the implicit promise by Defendants to protect it. Plaintiffs and the Class gave up their privacy to Defendants in exchange for protecting it from others, and Defendants accepted this exchange because they would realize a financial benefit by providing services related to this PII.

297. Instead of providing a reasonable level of security that would have prevented the Data Breach, however, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and the Class by utilizing cheaper, ineffective security measures. Plaintiffs and the Class, on the other hand, suffered a direct and proximate result of Defendants' failure to provide the requisite security.

298. But for Defendants' willingness and commitment to maintain privacy and confidentiality, that PII would not have been transferred to and entrusted with Defendants. Indeed, if Defendants had informed their customers that their data and cyber security measures were inadequate, Defendants would not have been permitted to continue to operate in that fashion.

299. As a result of Defendants' wrongful conduct, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the Class. Defendants continue to benefit and profit from their retention and use of the PII while its value to Plaintiffs and the Class has been diminished.

300. Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged in this Complaint, including compiling, using, and retaining Plaintiffs' and the Class's PII, while at the same time failing to maintain that information securely from intrusion and theft by cyber criminals, hackers, and identity thieves.

301. Plaintiffs and the Class have no adequate remedy at law.

302. Under principals of equity and good conscience, Defendants should not be permitted to retain the benefits obtained from Plaintiffs and the Class because Defendants failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiffs and the Class were entitled to, and that were mandated by federal, state, and local laws and industry standards.

303. Defendants acquired a monetary benefit and PII through inequitable means, in that they failed to disclose the inadequate security practices previously alleged.

304. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm.

Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and the Class, proceeds that they unjustly received.

305. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiffs and the Class have suffered, and will continue to suffer, ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identify theft crimes, fraud, and abuse resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic time that the Plaintiffs and Class have not been compensated for.

306. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm.

## COUNT VII
## Breach of Contract
## (On Behalf of Plaintiff Wardrop and the CUO Subclass against CUO)

307. Plaintiff Wardrop and the CUO Subclass reallege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

308. CUO entered into various written contracts with Plaintiff Wardrop and CUO Subclass Members to perform services that include, but are not limited to, financial services.

309. These contracts were made in part for the benefit of Plaintiff Wardrop and the CUO Subclass. Indeed, CUO knew that if it were to breach these contracts with its customers – its customers, including Plaintiff Wardrop and CUO Subclass Members, would be harmed by, among other things, fraudulent misuse of their PII.

310. It was intended by CUO at the time the contracts were made that CUO would assume a direct obligation to protect Plaintiff Wardrop's and the CUO Subclass's PII.

311. It was also intended by CUO that the performance under the contract would necessarily and directly benefit Plaintiff Wardrop and the CUO Subclass. CUO would utilize the PII it collected in providing timely and accurate financial services to its customers.

312. CUO breached its contracts with Plaintiff Wardrop and the CUO Subclass Members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiff Wardrop's and the CUO's PII in a manner that complies with applicable laws, regulations, and industry standards, and resulting compromise of Plaintiff Wardrop's and the CUO Subclass Members' PII.

## COUNT VIII
## Breach of Contract
## (On Behalf of Plaintiff McKinley and the Beacon Subclass against Beacon)

313. Plaintiff McKinley and the Beacon Subclass reallege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

314. Beacon entered into various written contracts with Plaintiff McKinley and Beacon Subclass Members to perform services that include, but are not limited to, financial services.

315. These contracts were made in part for the benefit of Plaintiff McKinley and the Beacon Subclass. Indeed, Beacon knew that if it were to breach these contracts with its customers, its customers, including Plaintiff McKinely and Beacon Subclass Members, would be harmed by, among other things, fraudulent misuse of their PII.

316. It was intended by Beacon at the time the contracts were made that Beacon would assume a direct obligation to protect Plaintiff McKinley's and the Beacon Subclass's PII.

317. It was also intended by Beacon that the performance under the contract would necessarily and directly benefit Plaintiff McKinley and the Beacon Subclass. Beacon would utilize the PII it collected in providing timely and accurate financial services to its customers.

318. Beacon breached its contracts with Plaintiff McKinley and the Beacon Subclass Members in failing to implement and maintain reasonable security measures

to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiff McKinley's and the Beacon Subclass Members' PII in a manner that complies with applicable laws, regulations, and industry standards, and resulting compromise of Plaintiff McKinley's and the Beacon Subclass Members' PII.

**COUNT IX**
**Breach of Contract**
**(On Behalf of Plaintiff Poplawski and the AmeriCU Subclass Against AmeriCU)**

319. Plaintiff Poplawski and the AmeriCU Subclass reallege and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

320. AmeriCU entered into various written contracts with Plaintiff Poplawski and AmeriCU Subclass Members to perform services that include, but are not limited to, financial services.

321. These contracts were made in part for the benefit of Plaintiff Poplawski and the AmeriCU Subclass. Indeed, AmeriCU knew that if it were to breach these contracts with its customers, its customers, including Plaintiff Poplawski and AmeriCU Subclass Members, would be harmed by, among other things, fraudulent misuse of their PII.

322. It was intended by AmeriCU at the time the contracts were made that AmeriCU would assume a direct obligation to protect Plaintiff Poplawski's and the AmeriCU Subclass's PII.

323. It was also intended by AmeriCU that the performance under the contract would necessarily and directly benefit Plaintiff Poplawski and the AmeriCU Subclass. AmeriCU would utilize the PII it collected in providing timely and accurate financial services to its customers.

324. AmeriCU breached its contracts with Plaintiff Poplawski and the AmeriCU Subclass Members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiff Poplawski's and the AmeriCU Subclass Members' PII in a manner that complies with applicable laws, regulations, and industry standards, and resulting compromise of Plaintiff Poplawski's and the AmeriCU Subclass Members' PII.

## COUNT X
## Breach of Fiduciary Duty
## (On Behalf of Plaintiff Wardrop and the CUO Subclass against CUO)

325. Plaintiff Wardrop and the CUO Subclass reallege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

326. Plaintiff Wardrop's and the CUO Subclass Members' PII was provided to CUO in confidence, believing that CUO would protect that information. CUO's customers would not have provided CUO with this information had they known they would not be adequately protected. CUO's acceptance and storage of Plaintiff

Wardrop's and the CUO Subclass Members' PII created a fiduciary relationship between CUO and Plaintiff Wardrop and the CUO Subclass Members.

327. In light of this relationship, CUO has a fiduciary duty to act for the benefit of its customers and Plaintiff Wardrop and the CUO Subclass Members upon matters within the scope of their relationship, which includes safeguarding and protecting Plaintiff Wardrop's and the CUO Subclass's PII.

328. CUO breached that duty by failing to properly protect the integrity of the system containing Plaintiff Wardrop's and the CUO Subclass Members' PII and otherwise failing to safeguard Plaintiff Wardrop's and the CUO Subclass Members' PII that it collected.

329. As a direct and proximate result of CUO's breaches of their fiduciary duties, Plaintiff Wardrop and the CUO Subclass Members have suffered and will continue to suffer injury, including, but not limited to (i) a substantially increased risk of identity theft and financial fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) the improper compromise, publication, and theft of their PII; (iii) deprivation of the value of their PII, for which there is a well-established national and international market; (iv) lost time and money incurred, and future costs required, to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and

will continue to face; and (v) the continued risk to their PII which remains in CUO's possession.

**COUNT XI**
**Breach of Fiduciary Duty**
**((On Behalf of Plaintiff McKinley and the Beacon Subclass against Beacon)**

330. Plaintiff McKinley and the Beacon Subclass realleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

331. Plaintiff McKinley's and the Beacon Subclass Members' PII was provided to Beacon in confidence, believing that Beacon would protect that information. Beacon's customers would not have provided Beacon with this information had they known they would not be adequately protected. Beacon's acceptance and storage of Plaintiff McKinley's and the Beacon Subclass Members' PII created a fiduciary relationship between Beacon and Plaintiff McKinley and the Beacon Subclass Members.

332. In light of this relationship, Beacon has a fiduciary duty to act for the benefit of its customers and Plaintiff McKinley and the Beacon Subclass Members upon matters within the scope of their relationship, which includes safeguarding and protecting Plaintiff McKinley's and the Beacon Subclass's PII.

333. CUO breached that duty by failing to properly protect the integrity of the system containing Plaintiff McKinley's and the Beacon Subclass Members' PII and

otherwise failing to safeguard Plaintiff McKinley's and the Beacon Subclass Members' PII that it collected.

334. As a direct and proximate result of Beacon's breaches of their fiduciary duties, Plaintiff McKinley and the Beacon Subclass Members have suffered and will continue to suffer injury, including, but not limited to (i) a substantially increased risk of identity theft and financial fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) the improper compromise, publication, and theft of their PII; (iii) deprivation of the value of their PII, for which there is a well-established national and international market; (iv) lost time and money incurred, and future costs required, to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (v) the continued risk to their PII which remains in Beacon's possession.

**COUNT XII**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff Poplawski and the AmeriCU Subclass against AmeriCU)**

335. Plaintiff Poplawski and the AmeriCU Subclass reallege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

336. Plaintiff Poplawski's and the AmeriCU Subclass Members' PII was provided to AmeriCU in confidence, believing that AmeriCU would protect that information. AmeriCU's customers would not have provided AmeriCU with this

information had they known they would not be adequately protected. AmeriCU's acceptance and storage of Plaintiff Poplawski's and the AmeriCU Subclass Members' PII created a fiduciary relationship between AmeriCU and Plaintiff Poplawski and the AmeriCU Subclass Members.

337. In light of this relationship, AmeriCU has a fiduciary duty to act for the benefit of its customers and Plaintiff Poplawski and the AmeriCU Subclass Members upon matters within the scope of their relationship, which includes safeguarding and protecting Plaintiff Poplawski's and the AmeriCU Subclass's PII.

338. AmeriCU breached that duty by failing to properly protect the integrity of the system containing Plaintiff Poplawski's and the AmeriCU Subclass Members' PII and otherwise failing to safeguard Plaintiff Poplawski's and the AmeriCU Subclass Members' PII that it collected.

339. As a direct and proximate result of AmeriCU's breaches of their fiduciary duties, Plaintiff Poplawski and the AmeriCU Subclass Members have suffered and will continue to suffer injury, including, but not limited to (i) a substantially increased risk of identity theft and financial fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) the improper compromise, publication, and theft of their PII; (iii) deprivation of the value of their PII, for which there is a well-established national and international market; (iv) lost time and money incurred, and future costs required, to

mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (v) the continued risk to their PII which remains in AmeriCU's possession.

## COUNT XIII
## Breach of Third-Party Beneficiary Contract
## (On Behalf of Plaintiffs Wardrop, McKinley, and Poplawski on behalf of the CUO Subclass, Beacon Subclass, and AmeriCU Subclass Against Doxim)

340. Plaintiffs Wardrop, McKinley, and Poplawski (for purposes of this section, "Plaintiffs") reallege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

341. Doxim entered into written contracts with CUO, Beacon, and AmeriCU to perform services that include, but are not limited to, print and digital document and statement services.

342. This contract was made in part for the benefit of Plaintiffs and the CUO, Beacon, and AmeriCU Subclasses, as Plaintiffs and Subclass Members were the intended third-party beneficiaries of the contract entered into between Defendants. Indeed, Defendants knew that if they were to breach the implied contract with CUO's, Beacon's, and/or AmeriCU's customers, then CUO's, Beacon's, and/or SLCCU's customers, including Plaintiffs and the Subclass Members, would be harmed by, among other things, fraudulent misuse of their PII.

343. It was intended by Doxim at the time the contracts were made that Doxim would assume a direct obligation to protect Plaintiffs' and the Subclass Members' PII.

344. It was also intended by Doxim that the performance under the contract would necessarily and directly benefit Plaintiffs and the Subclasses. Doxim would utilize the PII it collected in providing timely and accurate print and digital document and statement services for Plaintiffs and the Subclass Members, on behalf of CUO, Beacon, and AmeriCU.

345. Doxim breached its obligations under its implied contracts, to which Plaintiffs and the Subclass Members are intended beneficiaries, directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class Members have suffered.

346. As a direct and proximate result of Doxim's breach of implied contracts, Plaintiffs and all other Subclass Members suffered and will continue to suffer damages, because (i) they face a substantially increased risk of identity theft and financial fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their PII was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their PII has been breached; (iv) they were deprived of the value of their PII, for which there is a well- established national and international market; and (v) lost time and money incurred, and future costs required, to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

**COUNT XIV**
**Declaratory Judgment and Injunctive Relief**
**(On behalf of Plaintiffs and the Nationwide Class)**

347. Plaintiffs and the Nationwide Class reallege and incorporate all foregoing paragraphs.

348. Plaintiffs bring this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

349. Defendants owe a duty of care to Plaintiffs and the Class that require them to adequately secure Plaintiffs' and the Class Members' PII.

350. Defendants failed to fulfill their duty of care to safeguard Plaintiffs' and the Class Members' PII.

351. Plaintiffs and the Class are at risk of harm due to the exposure of their PII and Defendants' failure to address the security failings that lead to such exposure.

352. Plaintiffs, therefore, seeks a declaration that (1) Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with their explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing,

including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiffs and the Class for a period of ten years; and

h. Meaningfully educating Plaintiffs and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request judgment against Defendants and that the Court grant the following:

1. For an order certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

2. For an order enjoining Defendants from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of the PII belonging to Plaintiffs and the Class;

3. For injunctive relief requiring Defendants to:

   a. Engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

   b. Engage third-party security auditors and internal personnel to run automated security monitoring;

   c. Audit, test, and train its security personnel regarding any new or modified procedures;

   d. Segment their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

   e. Conduct regular database scanning and security checks;

   f. Routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

   g. Purchase credit monitoring services for Plaintiffs and the Class for a period of ten years; and

h. Meaningfully educate Plaintiffs and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

4. An order instructing Defendants to purchase or provide funds for credit monitoring services for Plaintiffs and all Class Members;

5. An award of compensatory, statutory, nominal and punitive damages, in an amount to be determined at trial;

6. An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

7. An award of reasonable attorney's fees, costs, and litigation expenses, as allowable by law; and

8. Any and all such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand this matter be tried before a jury.

Respectfully submitted,

Dated: December 9, 2024

*<u>/s/ E. Powell Miller</u>*

E. Powell Miller (P39487)
Emily E. Hughes (P68724)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Tel: (248) 841-2200

epm@millerlawpc.com
eeh@millerlawpc.com

Bryan L. Bleichner
Philip J. Krzeski
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South
Suite 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
Facsimile: (612)-336-2940
bbleichner@chestnutcambronne.com
pkrzeski@chestnutcambronne.com

Mariya Weekes
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel: (786) 879-8200
mweekes@milberg.com

Jeff Ostrow
**KOPELOWITZ OSTROW P.A.**
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
ostrow@kolawyers.com

*Interim Co-Lead Class Counsel*

William M. Sweetnam
**JOHNSON FIRM**
610 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
Tel.: (501) 777-7777
bill@yourattorney.com

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I electronically filed the foregoing document(s) using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com